574 F.Supp. 1573 (1983)
LOCAL CARTAGE ASSOCIATION, INC., OF GREATER ST. LOUIS, Plaintiff,
v.
HIGHWAY, CITY AND AIR FREIGHT DRIVERS, DOCKMEN AND HELPERS, LOCAL UNION NO. 600, Affiliated with International Association of Teamsters, Chauffeurs, Warehousemen & Helpers of America, et al., Defendants.
No. 83-2377C(1).
United States District Court, E.D. Missouri, E.D.
November 29, 1983.
*1574 John H. Dowell, Harris, Dowell, Fisher, McCarthy & Kaemmerer, Chesterfield, Mo., for plaintiff.
Cary Hammond, Diekemper, Hammond & Shinners, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, Chief Judge.
Plaintiff Local Cartage Association brought this action under section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, seeking permanent and preliminary injunctive relief against a threatened strike by defendants.
This case was heard by the court on October 21, 1983, in order to determine whether a preliminary injunction should issue. The court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law:

I. Findings Of Fact:

1. Plaintiff is a voluntary, unincorporated association, comprised of individuals, partnerships, corporations and companies. Such members of plaintiff act as private cartage carriers transporting property of others for compensation within the Greater St. Louis Metropolitan Area in Missouri and Illinois. Plaintiff is located in the City of St. Louis, Missouri. Plaintiff, as representative of said members, is engaged in industry affecting commerce, as defined in section 501 of the LMRA, 29 U.S.C. § 141 et seq.
2. Defendant Local No. 600 is an unincorporated, voluntary association or union, representing employees in the cartage industry in the City of St. Louis and St. Louis County, Missouri. Defendant represents certain non-supervisory employees of members of plaintiff as their collective bargaining representative for the purpose of dealing with plaintiff.
3. Plaintiff and defendant are parties to a collective bargaining agreement, in effect from April 1, 1982, through March 31, 1985. This collective bargaining agreement was entered into between defendant and plaintiff, as representative of its members. This collective bargaining agreement is known as the "St. Louis Area Addendum to the Central States Area Local Cartage Supplemental Agreement and National Master Freight Agreement Covering Employees of Local Cartage and Short Haul Carriers." This collective bargaining agreement actually consists of three (3) separate labor contracts: 1) the National Master Freight Agreement; 2) the Central States Area Local Cartage Supplemental Agreement; and 3) the St. Louis Area Addendum.
4. Article 8, Section 2(a)(3) of the National Master Freight Agreement, provides:
[t]he parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, except as specifically provided in other Articles of the National Master Freight *1575 Agreement, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by the Agreement except: ... (3) failure to make health and welfare and pension payments in the manner required by the applicable Supplemental Agreement; ....
(emphasis added).
5. Article 45 of the Central States Area Local Cartage Supplemental Agreement creates a mandatory grievance procedure. This procedure is supplemental by Article 17 of the St. Louis Area Addendum, which provides for mandatory arbitration of grievances by a neutral panel of four (4) members. Article 45, section 2 of the Central States Area Local Cartage Supplemental Agreement, provides:
Notwithstanding anything herein contained, it is agreed that in the event any Employer is delinquent at the end of a period in the payment of his contribution to the Health and Welfare or Pension Fund or Funds created under this Agreement, in accordance with the rules and regulations of the Trustees of such Funds, after the proper official of the Local Union has given seventy-two (72) hours notice to the Employer of such delinquency in Health and Welfare and Pension payments, the Local Union or Area Conferences, shall have the right to take such action as they deem necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employers shall be responsible to the employees for losses resulting therefrom.
(emphasis added).
6. Article 54, which is the "applicable Supplemental Agreement" referred to in Article 8, Section 2(a)(3), provides, in part:
Effective April 1, 1982, the Employer shall contribute to the CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND the sum of forty-five dollars and fifty cents ($45.50) per week for each employee covered by this Agreement who has been on the payroll thirty (30) days or more. There shall be no other increase in the Employer contribution during the term of this Agreement except those amounts which are allocated by the Joint National Master Committee from the cost-of-living adjustment provided by Article 33. Such allocation shall be uniform in amount, and to the extent possible, in the sole discretion of the Joint National Master Committee, such uniform amount shall provide for the maintenance of Health and Welfare benefits in effect on January 1, 1982. If the allocation of the entire amount of the cost-of-living adjustment provided by Article 33 is less than the uniform amount so determined, the Employer contribution will be increased to the uniform amount determined by the Joint National Master Committee.
(emphasis added).
7. Article 26 of the St. Louis Area Addendum provides, in part:
The parties agree that during the sixty (60) day period prior to March 31, 1983, the parties will meet at the written request of either party for the purpose of discussing whether or not to implement the cost-of-living increase or any portion thereof, provided for in Article 33 of the Master Freight Agreement to be effective April 1, 1983.
(emphasis added).
8. Plaintiff's members have continuously contributed to the Central States, Southeast and Southwest Areas Health and Welfare Fund at the rate of $45.50 per week per employee covered by the collective bargaining agreement. Effective April 1, 1983, the Joint National Master Committee increased the uniform amount to $58.70 per week per employee. Several plaintiff members have refused to contribute at the increased rate. Because plaintiff members contribute at a rate of $45.50 per week per employee, the Health and Welfare Fund has downgraded the benefits to plaintiff's members' employees from the C-5 plan to the C-4 plan.
9. On September 30, 1983, defendant filed a grievance over the failure of plaintiff's *1576 members to contribute at a rate of $58.70 per week per employee.
10. On October 10, 1983, defendant gave plaintiff's members notice of their intention to "take appropriate economic steps against your operations," commencing seventy-two hours from receipt of the letter, due to plaintiff's members' failure to pay the $58.70 rate.
11. On October 12, 1983, plaintiff sent defendant a telegram advising that the threatened strike would be unlawful and that plaintiff was ready, willing and able to utilize the grievance procedure to resolve the dispute.
12. A substantial loss of cartage work and damage will be suffered if a strike occurs, with resultant losses to plaintiff's members and no wages received by striking members of defendant. Plaintiff's members compete with many new, non-union trucking firms and plaintiff's members would lose much of their business to these competitors in the event a strike occurred. The competition for customers in the Greater St. Louis Metropolitan Area is intense and many local trucking firms have been driven out of business in recent years. Therefore, a strike is likely to cause irreparable damage to plaintiff's members.

II. Conclusions of Law:

This case is now before this Court for a determination of whether a preliminary injunction, enjoining defendant from striking plaintiff's members over the question of the rate at which plaintiff's members must contribute to the Health and Welfare Fund, should issue. This Court has power to exercise jurisdiction over plaintiff's request pursuant to the Labor Management Relations Act, 29 U.S.C. § 185, and 28 U.S.C. § 2201. See Layne-Western Co. v. Int'l Union of Operating Engineers, AFL-CIO Local Union No. 513, 503 F.Supp. 160, 163 (E.D.Mo.1980), aff'd in part and rev'd in part, 650 F.2d 155 (8th Cir.1981). However, the provisions of the Norris-LaGuardia Act, 29 U.S.C. §§ 101 et seq., restrict the power of this Court to issue an injunction in a labor dispute. Before determining whether plaintiff has established the traditional prerequisites for obtaining a preliminary injunction, therefore, this Court must first address the issue of whether the Norris-LaGuardia Act deprives this Court of jurisdiction to issue a preliminary injunction in this case.
In Boys Market, Inc., v. Retail Clerks Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), the Supreme Court carved out an exception to Norris-LaGuardia's prohibition against labor injunctions to accommodate the federal policy favoring arbitration of labor disputes over economic warfare. Under the Boys Market exception to Norris-LaGuardia, a strike may be enjoined where the underlying dispute is subject to a contractual grievance procedure. The Boys Market exception is thus a means of "effectuating the national policy favoring agreements to arbitrate ...." Purex Corp. v. Automotive, Petroleum and Allied Industrial Employees Union, Local 618, 705 F.2d 274 (8th Cir.1983).
The Boys Market exception is a narrow one, however, and its scope has been refined by two subsequent Supreme Court decisions. In Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), the Court distinguished between strikes where the dispute giving rise to the strike is arbitrable and strikes where the only arbitrable issue is the legality of the strike itself. The strike in Buffalo Forge was a sympathy strike and was not caused by any dispute that was "even remotely subject to the arbitration provisions of the contract." 428 U.S. at 407-09, 96 S.Ct. at 3147-48. The issue of whether the sympathy strike violated the no-strike clause in the collective bargaining agreement was arbitrable, but this type of arbitrable dispute did not give rise to a Boys Market injunction. The underlying dispute, not the legality of the strike, must be arbitrable for a Boys Market injunction to issue. Elevator Manufacturers' Association of N.Y., Inc., v. Local 1, International Union of Elevator Contractors, 689 F.2d 382, 385 (2d Cir.1982). The Buffalo Forge distinction was recently affirmed by the Court in Jacksonville Bulk *1577 Terminals, Inc., v. International Longshoremen's Association, 457 U.S. 702, 102 S.Ct. 2673, 73 L.Ed.2d 327 (1982), where the Court held that a strike, the legality of which was arbitrable, could not be enjoined because the underlying dispute was not arbitrable. 457 U.S. at 719, 102 S.Ct. at 2684.
It is clear that besides an arbitrable underlying dispute, a necessary precondition to the issuance of a Boys Market injunction is a finding that the union has an affirmative duty not to strike. In Boys Market the strike violated a no-strike clause. See Jacksonville Bulk Terminals, Inc., 457 U.S. at 708 n. 6, 102 S.Ct. at 2679 n. 6. In Gateway Coal Co. v. Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), where the contract lacked an express no-strike clause, the court implied a no-strike obligation from the union's duty to arbitrate the underlying dispute and therefore enjoined the strike. However, the Court indicated that it would be possible to agree to both a broad arbitration provision and an express exception to a no-strike obligation:
[i]t would be unusual, but certainly permissible, for the parties to agree to a broad mandatory arbitration provision yet expressly negate any implied no-strike obligation. Such a contract would reinstate the situation commonly existing before our decision in Boys Market. Absent an expression of such an intention, however, the agreement to arbitrate and the duty not to strike should be construed as having coterminous application.
Id. at 382, 94 S.Ct. at 639. Again referring to the possible effect of an exception to a no-strike clause on the availability of a Boys Market injunction, the Court in Buffalo Forge stated:
had the contract not contained a no-strike clause or had the clause expressly excluded sympathy strikes, there would have been no possible basis for implying from the existence of an arbitration clause a promise not to strike that could have been violated by the sympathy strike in this case. Gateway Coal Co. v. Mine Workers, supra 414 U.S. at 382, 94 S.Ct. at 639.
428 U.S. at 408, 96 S.Ct. at 3148.
The facts of the case at bar invoke all of the above principles, because the contract here has a broad mandatory grievance procedure, a no-strike clause, and an express exception to the no-strike clause. In addition, there are actually two contractual disputes here: first, whether plaintiff's members are contributing to the Health and Welfare Fund at the rate at which they are obligated to contribute under the contract; and second, whether defendant's threatened strike would be a violation of the no-strike clause or whether it would fall within the express exception to the no-strike clause. It is the opinion of this Court, and the parties do not contend otherwise, that the underlying dispute here, i.e., whether plaintiff's members are contributing at the correct rate, is an issue that is subject to the mandatory grievance procedure. The language in Article 8, Section 2(a) is clearly broad enough to cover interpretation of the contractual obligation of plaintiff's members to pay at a higher rate. See Finding of Fact No. 4. Moreover, defendant seemingly admits that the underlying dispute is arbitrable and subject to the grievance procedure, in that it was defendant who filed a grievance over the failure of plaintiff's members to pay at the rate of $58.70 per employee per week. See Finding of Fact No. 9. An arbitrator would have to consider the effect of Article 26 of the St. Louis Area Addendum on Articles 33 and 54 of the Central States Area Local Cartage Supplemental Agreement, to determine whether plaintiff's members are obligated to pay the increased uniform rate. Therefore, the first precondition to issuance of a Boys Market injunction, namely arbitrability of the underlying dispute, is satisfied.
The more serious question raised by the parties, however, is whether defendant was under an obligation not to strike, before resorting to the grievance procedure, over the underlying issue. Defendant argues that it was not under such an obligation *1578 because the exception to the no-strike clause in Article 8, Section 2(a)(3) applies to this strike. Defendant interprets the exception to mean that:
a grievance or question of interpretation concerning failure to make health and welfare payments is one of the disputes expressly excluded from the no-strike clause. Plainly, the Union has reserved the right to strike over disputes concerning health and welfare contributions.

Defendant's Memorandum In Opposition To Plaintiff's Application For Preliminary Injunction at 5 (emphasis added). Plaintiff argues that the exception does not apply where, as here, plaintiff's members are currently making payments to the Health and Welfare Fund and the underlying dispute involves the rate at which plaintiff's members should be contributing.
The correct interpretation of the exception to the no-strike clause is crucial to the availability of a Boys Market injunction, because if it reserved to defendant a right to strike over the underlying issue, even though the underlying issue is arbitrable, then a Boys Market injunction cannot issue. In other words, this may be one of those unusual cases referred to by the Court in Gateway Coal. Defendant contends that this is in fact one of those unusual cases and cites Layne-Western Company, Inc., v. International Union of Operating Engineers, AFL-CIO, Local Union No. 513, 650 F.2d 155 (8th Cir.1981), and Mohawk Rubber Company v. United Rubbers Workers, 462 F.Supp. 993 (E.D. Ohio 1978), as being in point. As is more fully explained below, it is the opinion of this Court that neither of these cases is persuasive authority and that the exception to the no-strike clause does not reserve to defendants the right to strike over the underlying dispute.
First of all, neither of the cases cited by defendant is factually in point for the reason that in both cases it was determined that the exceptions to the no-strike clauses involved therein had the effect of reserving to the union the right to strike over the underlying dispute. For example, in Layne-Western the underlying arbitrable dispute was whether the company was obligated to contribute to the union's pension, welfare and vacation funds for well drilling and soil testing work, even though not performed in connection with heavy or highway construction. Layne-Western, 650 F.2d at 156-59. The contract between the company and the union provided an exception to the no-strike clause "`[i]n the event the Employer fails to make ... payment of the contributions due to'" the union. Id. at 156. Layne-Western is factually distinguishable from the case at bar because in Layne-Western the employer had been notified by the fund that it was "delinquent" in making its contributions. Layne-Western Co. v. International Union of Operating Engineers, AFL-CIO, Local Union No. 513, 503 F.Supp. 160, 162 (E.D.Mo. 1980). Here of course, there has been no such notice. See Finding of Fact No. 8. The Mohawk Rubber case is also distinguishable because there the court found that the exception to the no-strike clause applied to the underlying arbitrable dispute and, therefore, the union had reserved the right to strike over that issue. Thus, a strike over that issue was not enjoined. Mohawk Rubber, 462 F.Supp. at 1001.
Arguably the reasoning of the Court of Appeals in Layne-Western bars this Court from issuing a preliminary injunction here. The court stated:
In this case, there is clearly an expressed exception to the no-strike clause for disputes regarding delinquencies to the funds. But whether such exception can be relied on when an underlying issue regarding the delinquency is arbitrable is not clear. The question can only be answered by determining the intention of the parties to the contract.
The authority to issue a preliminary injunction requires a finding that "the union was under a contractual duty not to strike." Gateway Coal Co., supra, 414 U.S. at 380, 94 S.Ct. at 638. Based on the peculiar facts of this case, we cannot say whether this arbitrable issue triggered a contractual duty not to strike. The issue is one which calls for an interpretation of the contract as to the meaning *1579 of the exception to the no-strike clause and the no-strike clause itself and is the type of issue the parties have by contract agreed to submit to arbitration. It is also the type of issue the Supreme Court found did not warrant injunctive relief in the Buffalo Forge decision.
Layne-Western, 650 F.2d at 159. The problem presented in Layne-Western is similar to the problem here, namely how do the Boys Market/Buffalo Forge cases apply where both the underlying dispute and the legality of the strike, which turns on the outcome of the underlying dispute, are arbitrable issues. The thrust of the Layne-Western opinion is that whenever the legality of the strike is itself an arbitrable issue, Buffalo Forge requires that a federal court refrain from issuing a Boys Market injunction. It is the opinion of this Court that the broad principle of Layne-Western does not follow from Buffalo Forge and, at least as applied to the facts of this case, Layne-Western is not controlling.[1]
Layne-Western does not follow from Buffalo Forge because, unlike the situation in Buffalo Forge and the more recent case of Jacksonville Bulk Terminals, Inc. which affirmed the rule of Buffalo Forge, the underlying dispute in Layne-Western, whether the employer was making the contributions that were "due," was arbitrable. The fact which makes the case at bar, and Layne-Western for that matter, unique is that the underlying arbitrable dispute, or the answer to the underlying dispute, determines whether the exception to the no-strike clause applies. In Buffalo Forge and Jacksonville Bulk Terminals, Inc., the underlying dispute was not arbitrable, whereas the legality of the strike was arbitrable, and the rule of Buffalo Forge is limited to that type of situation. Indeed, in Jacksonville Bulk Terminals, Inc., the Court read Buffalo Forge to mean that:
the Boys Market exception [to Norris-LaGuardia] does not apply when only the question whether the strike violates the no-strike pledge, and not the dispute that precipitated the strike, is arbitrable under the parties' collective bargaining agreement.
457 U.S. at 707, 102 S.Ct. at 2678 (emphasis added). Moreover, the Court stated that "the fact, essential to the rationale of Buffalo Forge, [was] that the strike was not over an arbitrable issue and therefore did not directly frustrate the arbitration process." Id. at 723, 102 S.Ct. at 2686. The rationale of Buffalo Forge is that "[s]triking over an arbitrable dispute would interfere with and frustrate the arbitrable process by which the parties had chosen to settle a dispute." Buffalo Forge, 428 U.S. at 407, 96 S.Ct. at 3147. Therefore, the result in Layne-Western was not mandated by Buffalo Forge because the fact that was essential to Buffalo Forge was absent in Layne-Western in that the underlying dispute was arbitrable.
Layne-Western is also not controlling due to the emphasis it placed on the fact that the interpretation of the exception to the no-strike was the type of issue the parties had agreed to submit to arbitration. Apparently the court felt that if it interpreted the exception to the no-strike clause to be inapplicable where the underlying issue that triggers its applicability was arbitrable, then it would in effect be displacing the arbitration machinery agreed upon by the parties. However, a federal court is required to make a preliminary interpretation of the agreement, in light of the surrounding circumstances, to determine whether the underlying dispute is arbitrable and whether the strike would violate a no-strike obligation. Elevator Manufacturers' Association of N.Y., Inc., v. Local 1, International Union of Elevator Constructors, 689 F.2d 382, 386 (2d Cir.1982); Kentucky West Virginia Gas Co. v. Oil, Chemical & Atomic Workers, 549 F.2d 407, 413 (6th Cir.1977); National Rejectors Industries v. United Steelworkers of America, 562 F.2d 1069 (8th Cir.1977), cert. *1580 denied, 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 517 (1978). "Otherwise it would rarely be possible to decide whether a case is governed by Boys Market or Buffalo Forge." Elevator Manufacturers, 689 F.2d at 386. If this Court, following Layne-Western, declines to make a preliminary determination of whether the no-strike exception applies where the underlying issue that triggers its applicability is arbitrable, then no injunction could ever issue and both the arbitrable process agreed upon by the parties and the federal policy favoring arbitration of grievances would be frustrated. Therefore, this Court holds that where an express exception to a no-strike clause is conditioned upon the determination of an underlying arbitrable dispute, a federal court is required to make a preliminary determination of whether the exception may be relied upon prior to the time the underlying dispute is resolved by the grievance procedure.
It is the opinion of this Court that the exception here to the no-strike clause does not become operative until such time as it has been determined by the grievance procedure that the employer is not making its payments to the fund "in the manner required by the applicable Supplemental Agreement." See Finding of Fact No. 4. The exception is not as broad as defendant contends. Defendant argues that the no-strike promise does not apply where there is any dispute over the Health and Welfare Fund. The plain language of the exception, however, limits its effect to situations where the employer is not paying in a particular manner. Because the "manner required by the applicable Supplemental Agreement" is a question that turns on an interpretation of the contract, defendant has promised to resolve that question by the grievance procedure. That promise would be meaningless and illusory if defendant could strike over the question of the "manner required by the applicable Supplemental Agreement." The only logical interpretation of the exception to the no-strike clause is that it does not become operative until after it has been determined by the grievance process that the employer is not paying in the "manner required by the applicable Supplemental Agreement." This interpretation is also consistent with the important federal policy favoring the peaceful resolution of labor disputes by contractually agreed upon procedures.
Accordingly, this Court concludes that the underlying dispute here, whether plaintiff's members are contributing to the Health and Welfare Fund in the "manner required by the applicable Supplemental Agreement," is subject to the mandatory grievance procedure; and that a strike over this dispute, prior to a determination by the grievance process that plaintiff's members are not contributing in the "manner required by the applicable Supplemental Agreement," would violate the no-strike pledge in the collective bargaining contract. The only question that remains is whether the traditional criteria for issuing a preliminary injunction are satisfied.
Whether a preliminary injunction should issue involves consideration of:
(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.
Dataphase Systems, Inc., v. C.L. Systems, Inc., 640 F.2d 109, 113 (8th Cir.1981). In the present case, each of these factors warrants enjoining defendants from striking pending resolution of the underlying dispute.
First, given the condition of the market in which plaintiff's members operate, there is a strong threat of irreparable injury from a strike by defendant's members. See Finding of Fact No. 12. Second, preliminary injunction is not likely to cause any harm to defendant. Defendant has agreed to resolve the underlying dispute according to the grievance procedure. See Finding of Fact No. 9. A preliminary injunction will not prejudice defendant's right to strike, at a later date, to force plaintiff's members to pay at the rate of $58.70 if defendant is successful in the grievance procedure. The risk of harm to *1581 defendant during the interim is minor in comparison to the threat of harm to plaintiff's members in the absence of a preliminary injunction. Third, it appears probable that plaintiff will succeed on the merits. Under Article 54 plaintiff's members cannot be required to pay more than $45.50, with the exception of the Article 33 cost-of-living increase. However, Article 26 of the St. Louis Area Addendum seems to exclude Article 33 from applying to these parties. Therefore, plaintiff's members have a strong argument that $45.50 is the rate that is in accordance with the "applicable Supplemental Agreement." See Findings of Fact Nos. 4, 5, 6 and 7. Finally, the public interest in the peaceful resolution of labor disputes and in the transportation of goods without interruption supports issuing a preliminary injunction here.
Accordingly, for the reasons stated above, it is the opinion of this Court that plaintiff's motion for a preliminary injunction should be, and the same is, granted.
NOTES
[1] In this regard, it is worth noting that at least part of the holding of Layne-Western has been expressly overruled or seriously undermined by subsequent Eighth Circuit decisions. See Bugher v. Consolidated X-Ray Service Corp., 705 F.2d 1426, 1433 n. 12 (8th Cir.1983); Robbins v. Prosser's Moving & Storage Co., 700 F.2d 433, 438 (8th Cir.1983).